UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| UNITED STATES OF AMERICA, |
| -against- |
| TEIMURAZ TAVBERIDZE, |
| Defendant. |

23-cr-585-03 (JSR)

OPINION

JED S. RAKOFF, U.S.D.J.:

The Sixth Amendment to the U.S. Constitution guarantees every person accused of a federal felony the right to a speedy and a public trial before a jury of the accused's peers. See U.S. Const. amend. VI. Among the many important purposes this Amendment serves, one of the most vital is exposing to public scrutiny, and community approval or disapproval, just how our criminal justice system operates. Yet, in realty, these functions are no longer being served, for the jury trial has been replaced, almost exclusively, by a system of secret plea-bargaining negotiations behind closed doors. Thus, in 2024, only 2.4 percent of all federal felony indictments went to trial, and this paltry percentage has remained more or less constant for the past decade and more. See Criminal Defendants Disposed of, by Type of Disposition and Offense, During the 12-Month Period Ending June 30, 2024, Table D-4, U.S. Courts (2024).

1

Why do so few cases go to trial?  One reason is the so-called "trial penalty." Since a prosecutor typically charges -- and is currently required to charge at the outset[1] -- the most serious crimes she can prove, a plea bargain to a lesser charge reduces the risk of the often much higher penalty a defendant would face if convicted at trial. And given the prevalence of legislatively-prescribed mandatory minimum prison terms, there is little a judge can do about this in many cases. Moreover, even in those cases where the charges do not carry mandatory minimum prison terms, the Sentencing Guidelines ("Guidelines") effectively reinforce the trial penalty by reducing the offense level calculation by two points if the defendant "clearly demonstrates acceptance of responsibility" by pleading guilty, and by a third point if, in the Government's view, the defendant has pled guilty quickly enough to permit the prosecutor to avoid preparing for trial. U.S.S.G. § 3E1.1. While the underlying theory of the two-point reduction is that a guilty plea evidences, and rewards, a defendant's remorse,[2]

---

[1] See Memorandum from Emil Bove, Acting Deputy Attorney General, to All Department of Justice Employees 1-2 (Jan. 21, 2025).

[2] The presumption that genuine remorse is evidenced by a plea of guilty is an empirically unsubstantiated theory that is especially suspect in a system where there is such great pressure to plead guilty in order to avoid the trial penalty. In this Court's experience, when a defendant during a guilty plea inevitably states "I'm sorry," what he often really means is that he is sorry that he was caught and that he is sorry that the risk of incurring a

the third point reduction is justified simply on the ground of saving prosecutorial resources. See id. at cmts. 1 & 6.

In a small effort to try to mitigate the trial penalty, this Court, where appropriate (as in cases involving a single crime or unified criminal activity where no mandatory minimum is involved), typically informs an accused that if he goes to trial and is convicted, the Court will not impose a greater sentence than if he pleads guilty to the same activity.[3] And such a promise was made in this case. See ECF No. 103, Hearing Transcript at 2:18-4:6. Indeed, because the Court had already sentenced several co-defendants, it already had a good idea of the likely sentence it would impose if the defendant, Mr. Tavberidze, were found guilty. The Court was therefore not surprised that the defendant, while initially inclined to plead guilty, see id. at 2:15-16, after being informed of the Court's sentencing policy chose to go to trial --

_____

trial penalty if he goes to trial is so great that he does not dare exercise his constitutional right to put the Government to its proof.

[3] Some judges with whom the undersigned has discussed this practice have questioned whether it unwisely prevents a judge from taking account at sentencing of relevant facts elicited at trial. But in this Court's experience, those same facts would be fully elicited even where the defendant just chose to plead guilty, by the detailed sentencing memoranda a federal judge typically receives from both sides prior to sentencing, as well as, where key facts are disputed, by the evidentiary ("Fatico") hearings then held by the judge prior to sentencing.

with all the benefits to society that a trial brings by putting the Government to the test.

In due course, the defendant was convicted by a jury and will be sentenced shortly. It follows from the practice of this Court outlined above that the Court, though required to calculate the range of months of imprisonment recommended by the Guidelines, will disregard the three points effectively added to the offense level that would have been removed if the defendant had pleaded guilty. But on further reflection, the Court has reached the conclusion that one of those three points, effectively added to the calculated offense level because of the failure of the defendant to save the Government resources, pursuant to section 3E1.1(b) of the Guidelines, ought not even be included in the Guidelines calculation at all, because in reality it is an unconstitutional penalty imposed on a defendant for exercising his constitutional right to trial. The Court thus issues this pre-sentence Opinion to inform the parties of this conclusion, so that, if the Government disagrees, it can be heard at the time of sentencing.

The reasons for the Court's conclusion that section 3E1.1(b) is, in effect, an unconstitutional trial penalty are as follows.

I.    Section 3E1.1(b)

In 1984, Congress passed the Sentencing Reform Act ("SRA"), which established the Sentencing Commission (the "Commission"), an independent agency within the judicial branch tasked with promulgating the Guidelines and issuing policy statements concerning their application. See Dillon v. United States, 560 U.S. 817, 820 (2010) (discussing 28 U.S.C. §§ 991-998); see generally Kate Stith & José A. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts (1998) (describing the history of the Commission and the Guidelines). The Guidelines define a range for sentencing a criminal defendant based on the seriousness of his offense (his "offense level") and his criminal history. See Molina-Martinez v. United States, 578 U.S. 189, 193 (2016).

When Congress passed the SRA, the Guidelines were binding and district courts lacked discretion to impose sentences outside a defendant's Guidelines range except under very limited circumstances. See Dillon, 560 U.S. at 820. However, in United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the Guidelines advisory, rather than mandatory. Nevertheless, district courts are still required to "consult [the] Guidelines and take them into account." Hughes v. United States, 584 U.S.

675, 681 (2018).[4] As a result, the Guidelines continue to "provide the framework for the tens of thousands of federal sentencing proceedings that occur each year." Id.

To determine a defendant's offense level, a district judge must consider various factors set forth in the Guidelines. The judge begins with the "base offense level" of the defendant's substantive offense. From that base offense level, the judge must add or subtract specified numbers of points based on "specific characteristics" of the defendant's substantive offense. For example, in a robbery case, the judge must add a specified number of points if the defendant brandished a firearm, while in a fraud case the judge must add various specified numbers of points based on the size of the economic loss that resulted from the defendant's conduct. The judge also adds or subtracts additional specified numbers of points based on various "adjustments" that can apply to any offense, such as whether the defendant targeted a vulnerable victim or played a minimal role in the offense. The higher a defendant's offense level, the higher the recommended sentence under the Guidelines.[5]

---

[4] Unless otherwise indicated, all quotations omit internal alterations, brackets, citations, ellipses, quotations, and quotation marks.

[5] To a remarkable extent, the Commission has never articulated in other than conclusory fashion the bases for its overall numbering system, let alone its bases for picking particular numbers for particular offense levels or adjustments. Why, for example, the

One of the "downward adjustments" that a district judge considers in calculating a defendant's offense level is whether the defendant has accepted responsibility for his criminal conduct. This "adjustment" is outlined under the "Acceptance of Responsibility" provision of the Guidelines. See U.S.S.G. § 3E1.1. That provision has two parts, section 3E1.1(a) and section 3E1.1(b).

Under section 3E1.1(a), the district court must decrease a defendant's offense level by two points if the court determines that the defendant "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). In practice this almost always means that the defendant has agreed to plead guilty pursuant to a written plea bargain that includes a negotiated Guidelines range that specifies this two-point downward adjustment.

Under section 3E1.1(b), the Court must decrease the defendant's offense level by an additional point if (1) the defendant qualified for the two-point reduction under section 3E1.1(a), (2) the defendant's offense level "prior to the

_____

Guidelines prescribe the addition of two points for one adjustment and four for another -- as opposed to, say, three points for both, or one point for one and five points for another -- appears to be entirely lacking in any articulated statistical methodology, let alone empirical foundation.

operation of subsection (a) is level 16 or greater," and (3) the
Government has filed a motion confirming that:

> [T]he defendant has assisted authorities in the investigation
> or prosecution of his own misconduct by timely notifying
> authorities of his intention to enter a plea of guilty,
> thereby permitting the government to avoid preparing for
> trial and permitting the government and the court to allocate
> their resources efficiently.

Id. at § 3E1.1(b). "Preparing for trial" refers to "substantive
preparations taken to present the government's case against the
defendant to a jury," including creating and sharing witness and
exhibit lists, meeting with witnesses to discuss their testimony,
and drafting motions in limine and jury instructions. Id. As long
as the defendant pleads guilty before the Government has engaged
in any of those activities, the defendant may be eligible for the
additional one-level reduction. However, the Commentary further
explains that "an adjustment under subsection (b) may only be
granted upon a formal motion by the Government at the time of
sentencing" because "the Government is in the best position to
determine whether the defendant has assisted authorities in a
manner that avoids preparing for trial." Id.

    II.  The Sixth Amendment Problem

    As noted above, the Sixth Amendment guarantees, "[i]n all
criminal prosecutions," the "right to a speedy and public trial,
by an impartial jury." U.S. Const. amend. VI. The Founders intended
for that text to serve a critical function in our constitutional

system of government. "Together with the right to vote, those who wrote our Constitution considered the right to trial by jury 'the heart and lungs, the mainspring and center wheel' of our liberties, without which 'the body must die[,] the watch must run down[,] [and] the government must become arbitrary.'" United States v. Haymond, 588 U.S. 634, 640-41 (2019) (quoting Letter from Clarendon to W. Pym (Jan. 27, 1766), in 1 Papers of John Adams 169 (R. Taylor ed. 1977)). "Just as the right to vote sought to preserve the people's authority over their government's executive and legislative functions, the right to a jury trial sought to preserve the people's authority over its judicial functions." Id. at 641 (citing J. Adams, Diary Entry (Feb. 12, 1771), in 2 Diary and Autobiography of John Adams 3 (L. Butterfield ed. 1961); and 2 J. Story, Commentaries on the Constitution § 1779, 540-41 (4th ed. 1873)); see also Blakely v. Washington, 542 U.S. 296, 306 (2004) ("Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary."). In addition to serving as a check on the judiciary, the Sixth Amendment also "represent[ed] a deep commitment of the Nation to the right of jury trial in serious criminal cases as a defense against arbitrary law enforcement." Codispoti v. Pennsylvania, 418 U.S. 506, 515-16 (1974). Accordingly, the Supreme Court has "long explained that the Sixth

Amendment right to a jury trial is fundamental to the American scheme of justice." Ramos v. Louisiana, 590 U.S. 83, 93 (2020).

In this Court's view, section 3E1.1(b) violates the Sixth Amendment right to trial in at least two ways. First and foremost, section 3E1.1 in its entirety effectively penalizes a defendant who, whether innocent or guilty, proceeds to trial based on his decision to exercise his Sixth Amendment right to trial. But whereas section 3E1.1(a) at least arguably justifies this imposition as a reward for a defendant's demonstrating genuine remorse, the only ground given for imposing the additional penalty under 3E1.1(b) is that the defendant failed to save the Government from having to prepare for trial. This cannot possibly be an adequate ground for penalizing a defendant for the exercise of a constitutional right. Worse still, on this flimsy basis section 3E1.1(b) penalizes a defendant who just takes too long to decide whether he wants to assert his constitutional right to trial, even if he ultimately waives it.

The penalty can be significant. A one-point offense-level reduction can make a "substantial" difference in a defendant's Guidelines range. Longoria v. United States, 141 S. Ct. 978, 979 (2021) (Mem.) (statement of Sotomayor, J., joined by Gorsuch, J., regarding denial of petition for writ of certiorari). Indeed, "[f]or the most serious offenses," section 3E1.1(b)'s one-point reduction "can shift the Guidelines range by years, and even make

the difference between a fixed-term and a life sentence." Id.; see also The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save It, Nat'l Ass'n of Crim. Def. Laws. 40 (2018) (explaining that offense-level reductions outlined under section 3E1.1 may "mean the difference between having to serve jail time or being permitted to serve the sentence in home detention or on probation"). By thus subjecting a defendant to a heightened Guidelines range based solely on his decision to proceed to trial -- or even just for considering for too long, in the Government's view, his constitutional right to go to trial -- section 3E1.1(b) places an impermissible burden on the Sixth Amendment right.

True, district courts are no longer required to impose a sentence within a defendant's Guidelines range. However, the Guidelines still play, and are intended to play, a significant role in the sentencing determinations of district judges. As the Supreme Court has explained, "[t]he Guidelines enter the sentencing process long before the district court imposes the sentence." Molina-Martinez, 578 US. at 193. Prior to sentencing, the United States Probation Office ("Probation") prepares a presentence report ("PSR") that calculates the defendant's Guidelines range. See id.; see also Fed. R. Crim. P. 32(d)(1) (outlining how Probation should apply the Guidelines in preparing a PSR). The parties then file sentencing submissions, which tend

11

to focus on how the district judge should sentence the defendant within the Guidelines range or why the judge should deviate from it. Many of the materials the judge reviews in preparing for a defendant's sentencing hearing thus concern the defendant's Guidelines range.

At sentencing, the Guidelines continue to play an outsized role. Although district judges are tasked with imposing a sentence consistent with the sentencing factors outlined under 18 U.S.C. § 3553(a), they "must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." Rosales-Mireles v. United States, 585 U.S. 129, 133 (2018) (emphasis in original); see also Rita v. United States, 551 U.S. 338, 351 (2007) ("The sentencing judge, as a matter of process, will normally begin by considering the [PSR] and its interpretation of the Guidelines"). Moreover, "[a] district court contemplating a non-Guidelines sentence must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance." Peugh v. United States, 569 U.S. 530, 541 (2013); see also Freeman v. United States, 564 U.S. 522, 529 (2011) ("[I]f the judge uses the sentencing range as the beginning point to explain the decision to deviate from it, then the Guidelines are in a real sense a basis for the sentence."). As a result, "in the usual sentencing, the judge will use the Guidelines as the starting point in the analysis and impose a

sentence within the range." Peugh, 569 U.S. at 541. Indeed, the Commission's statistics have historically demonstrated the "real and pervasive effect the Guidelines have on sentencing," leading the Supreme Court to observe that the "there is considerable empirical evidence indicating that the Sentencing Guidelines have the intended effect of influencing the sentences imposed by judges." Molina-Martinez, 578 U.S. at 199-200.

After sentencing, the Guidelines "remain a meaningful benchmark through the process of appellate review." Peugh, 569 U.S. at 541. Courts of appeals "presume that a sentence imposed within a properly calculated Guidelines range is reasonable." Molina-Martinez, 578 U.S. at 201. And, "[i]n reviewing the reasonableness of a sentence outside the Guidelines range," courts of appeals "take the degree of variance into account and consider the extent of a deviation from the Guidelines." Gall v. United States, 552 U.S. 38, 47 (2007).

"[T]he post-Booker sentencing regime" thus imposes "procedural hurdles that, in practice, make the imposition of a non-Guidelines sentence less likely." Peugh, 569 U.S. at 542. In theory, a district judge is not required to enforce section 3E1.1(b)'s trial penalty. However, in practice, a district judge may do so unintentionally by imposing a sentence within a defendant's heightened Guidelines range. And, even if a district judge were inclined to sentence a particular defendant to a

substantially reduced term of imprisonment, the defendant would still face pressure to plead guilty at the outset of his case, rather than after more deliberate investigation, lest he render himself ineligible for section 3E1.1(b)'s one-level reduction. Accordingly, both by pressuring a defendant to plead guilty at the outset of his case and increasing the severity of his Guidelines range at its conclusion, section 3E1.1(b) penalizes the exercise of the right to trial and thereby violates the Sixth Amendment.

Section 3E1.1(b) also violates the Sixth Amendment for the related reason that it conditions the application of the one-level reduction on a motion by the Government. Pursuant to section 3E1.1(b), a district judge cannot apply the one-level reduction except "[u]pon motion of the government." U.S.S.G. § 3E1.1(b); see also U.S.S.G. § 3E1.1 cmt. 6 ("[A]n adjustment under subsection (b) may only be granted upon a formal motion of the Government at the time of sentencing."). By empowering the Government, rather than the district court, to determine the extent to which the defendant has relieved it of that burden and to decide whether he is therefore entitled to the reduction, section 3E1.1(b) amplifies the pressure exerted on a defendant to plead guilty, rather than proceed to trial. In this way, section 3E1.1(b)'s requirement that

the Government move for the one-level reduction further burdens
the exercise of the Sixth Amendment right.[6]

III. Conclusion

Because of the odd way in which section 3E1.1 as a whole is
phrased -- as a reduction in offense level for a defendant's not
exercising his constitutional right to go to trial -- the remedy
for the Court's conclusion that section 3E1.1(b) is
unconstitutional is to reduce the penalty thereby effectively
imposed on those who choose not to avail themselves of the
"benefit" of section 3E1.1(b). The Court therefore concludes that
in this, and indeed every case in which a defendant chooses to go
to trial but is convicted by a jury, or in which the defendant
simply chooses to consider going to trial until after the

---

[6] To be sure, section 3E.1(b) is not entirely alone in requiring a
motion from the Government. Specifically, section 5K1.1 allows
district courts to "depart from the guidelines" upon "motion of
the government stating that the defendant has provided substantial
assistance in the investigation or prosecution of another person
who has committed an offense." U.S.S.G § 5K1.1. However, section
5K1.1 does not directly implicate a defendant's Sixth Amendment
right to trial. Unlike section 3E1.1(b), which requires a district
judge to apply a one-level reduction based solely on a defendant's
decision to waive his Sixth Amendment right to trial, section 5K1.1
permits a district judge to depart from a defendant's Guidelines
range based on additional information provided by the Government
at the time of sentencing, consistent with the sentencing factors
outlined under section 3553(a). Indeed, the Commentary
accompanying section 5K1.1 specifically distinguishes section
5K1.1 from section 3E1.1. See U.S.S.G. § 5K1.1 cmt. 2 ("Substantial
assistance is directed to the investigation and prosecution of
criminal activities by persons other than the defendant, while
acceptance of responsibility is directed to the defendant's
affirmative recognition of responsibility for his own conduct.").

Government has already started preparing for trial, the formal calculation of the offense level must be reduced by one point, because the effect of not giving the one-point reduction to someone who chose to exercise, or considered exercising, his right to go to trial rather than save the Government some time and money is effectively an unconstitutional penalty on all who made that choice.

Whether the other, two-point reduction authorized by section 3E1.1(a) for those who plead guilty and thereby allegedly show their remorse is nonetheless itself an unconstitutional penalty imposed for their exercise of their constitutional right to trial is an issue the Court need not reach in this case, since the Court, for the discretionary and policy reasons stated at the outset of this Opinion, will in any case treat Mr. Tavberidze as having the equivalent of a Guidelines range three points less than what the formal Guidelines calculation would otherwise mandate.[7]

For the foregoing reasons, while the PSR calculates the offense level in this case at 20, the Court, subject to hearing

---

[7] It is, of course, well settled that courts have considerable discretion to vary from the Guidelines based, not only on circumstances pertaining to the individual defendant, but also "solely on policy considerations" and disagreements with the Commission's views. Kimbrough v. United States, 552 U.S. 85, 101 (2007); see also Pepper v. United States, 562 U.S. 476, 501 (2011) ("[O]ur post-Booker decisions make clear that a district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views.").

from counsel at the time of sentencing, will calculate the offense level as 19, but will treat the defendant for purposes of sentencing as if he had an offense level of 17.

New York, NY

March 10, 2025

_____

JED S. RAKOFF, U.S.D.J.